HELENE N. WHITE, Circuit Judge
(concurring in part, dissenting in part).
I agree with the majority’s determinations with two exceptions. I conclude that issues of fact precluded summary judgment on Everest’s claims that Crestwood violated an implied contract to manage Petionville, and on both parties’ claims that the other breached the 2008 purchase and sale agreement.

Implied Contract to Manage Petionville

Everest presented evidence that, beginning early on in the parties’ relationship, Crestwood co-managed Petionville and his stallion career, and provided services for Petionville that went beyond animal husbandry. Nielsen testified that McLean undertook to market Petionville, and that he and McLean jointly set Petionville’s stud fee, although the final decision was Nielsen’s. PID 3005-06, 3007. McLean, Sr., acknowledged that he cancelled “a few” of Petionville’s service contracts without contacting Nielsen, and that “there could have been a few” times he decided which mares were going to be bred to Petionville without consulting Nielsen. PID 3032-33. Everest produced numerous written “Stallion Service” agreements signed by McLean, not Nielsen, for Petionville breeding sessions. See PID 3307-08 (3/11/97), 3309-10 (3/20/98), 3312-13 (6/6/2000), 3314-15 (1/24/2001), 3316-17 (1/21/2002), 3349 (12/30/2002), 3347-48 (1/6/2003), 3318-19 (3/6/2003), 3320-21 (3/5/2004), 3302-03 (3/26/2004), 3322-23 (1/4/2005), 3324-25 (11/18/2005), 3326-27 (1/12/2007), 3328-29 (2/14/2008), 3330-31 (1/19/09) (sealed). Although Crestwood maintains that these agreements evidence *448 simply that it administered the paperwork for breeding Petionville and not that it managed Petionville, a reasonable factfinder could conclude otherwise. Everest also submitted letters McLean sent breeders in January 2000 and January 2004, thanking them for their past support of Petionville and urging them to consider breeding mares to Petionville again. The 2004 letter stated:
Dear Breeder,
We would like to thank you for your past support of Petionville. Those of us that had the foresight to breed to Petionville initially, believing in his future stallion potential were right, and his success has become a reality!
Petionville has achieved some very impressive statistics from his first four crops. His name is continually found among the top leading sires’ lists in various categories. His ability to sire a sound, fast, and precocious athlete is indicated by his 80% starters from foals, 67% winners from starters, and 26% 2-year old winners from starters. He sired an impressive seven stakes winners in 2003. Thus far his crowning achievement is Island Fashion, winner of the Alabama Stakes (Gl) at Saratoga, and the LaBrea (Gl) at Santa Anita and has- earnings of $1,112,970. His achievements are not based on a single championship caliber superstar, but an impressive roster of solid Graded stakes winners/horses and $100,000 + stakes winning earners as well! (see stallion page).
Petionville was an impressive dual Louisiana (G2) and Ohio Derby (G2) winner of over $811,000. Petionville’s pedigree is equally impressive, being by champion sire-of-sires Seeking the Gold, a son of Mr. Prospector. Possibly his real genetic strength comes from his dam Vana Turns who produced Kentucky Oaks (Gl) winner Pike Place Dancer.
As Petionville continues to climb the sire ranks, we invite you to consider Petionville again in 2004.
Sincerely,
Pope McLean
PID 3356 (dated 1/22/04) (italic and bold emphasis in original).
Nielsen also presented evidence supporting that Crestwood’s efforts surrounding Petionville dropped off after Nielsen received a $ 6.5 million offer to purchase Petionville in February 2005. Nielsen discussed the offer with McLean, Sr., who discouraged him from accepting the offer, and thereafter did little to market Petionville, contrary to representations that Crestwood would take Petionville “to the next level”:
Q. And what was the discussion with Mr. McLean?
A. He discouraged me from taking the offer.... He said that I would be leaving money on the table; that PETIONVILLE was right at the point where if he got to the next level, he would be worth millions more than the 6 and a half, and he told me that if Taylormade was interested at 6 and a half, that should tell me something; that they were very smart people and aggressive people and they were going to improve on the horse.
Q. And you said certain assurances were given to you during that conversation?
A. Correct.
Q. What were those assurances?
A. Just an acknowledgement that I was going to be passing up a lot of money, and that — the extra effort to take that horse to the next level would be made by Crestwood; they would *449 work ... very hard and extra hard and team up, and continue what they had been doing for the last several years and accelerate their efforts.
[A]fter I told [Pope McLean, Sr.,] that I was going to sell the horse, I think they only sold 18 seasons the rest of the year. I could be wrong on the amount, but it dropped significantly.
PID 2558, 2560. Nielsen also testified that McLean, Sr., had told him year after year that Crestwood had “a concentrated three person sales force,” and that it was only during discovery in the instant case that he learned that was not the case. PID 2560.
Further, the letter the majority quotes[1] does not doom Everest’s implied-contract claim. Maj. Op. at 440. Nielsen wrote Crestwood on July 31, 2009 regarding mare abortions and horse euthanasia. PID 2602-03. Crestwood’s motion for summary judgment characterized Nielsen’s letter as “summarizing] Crestwood’s involvement with PETIONVILLE and [Nielsen’s] general breeding operation” when, in fact, the letter makes no reference to Petionville or to Crestwood’s duties regarding Petionville’s management and promotion. The majority nonetheless relies on language in the letter’s final two paragraphs, where Nielsen states that Crestwood on numerous occasions
took credit for my spotless reputation in the horse industry and also attributed my success as a national top ten breeder to Crestwood. Crestwood had minimal involvement in my breeding operation .... Crestwood performed animal husbandry and cared for my horses ... However, Crestwood had no part in my breeding decisions, my genetic and/or catalogue mare selections, my selection of two year old trainers, and my race track and race horse management, and my ultimate earnings. The breeder owner ranking I achieved was based on race track monetary earnings. Crest-wood had nothing to do with that.
See PID 2603. This letter was written on the eve of this action being filed and while a possible settlement was being discussed, PID 3258 n. 8, and is subject to varying interpretations. The paragraph quoted above could be interpreted as an admission that Crestwood had minimal involvement in all of Everest’s breeding operations, including Petionville’s, or it could be interpreted otherwise, e.g., as referring to the fact that Crestwood had no hand in building Everest’s reputation from the mid-1980s, when Everest entered the horse business, until the mid-1990s, when the parties entered into a relationship or, as Nielsen testified, as simply responding curtly to Crestwood’s correspondence seeking credit for Everest’s accomplishments. PID 3258.
The majority’s determination that Nielsen’s “protocol” letter to Crestwood[2] *450 shows that “Crestwood never agreed to manage Petionville’s stud career” is a factual finding inappropriate at the summary-judgment stage. The letter does not establish that Crestwood did not manage Petionville’s stud career. The letter states, in sum, that Nielsen will have the right to “approve” any stud contract for Petionville, implying that Crestwood was involved in managing Petionville’s breeding contracts. Nielsen testified that he wrote the 1996 “protocol” letter in an'
attempt to suggest to Pope [McLean] kind of include me in the process here. I’m interested in the mares. I’m interested in who the clients are. Interested in what they are saying about PETIONVILLE. I mean literally ... we were almost talking everyday [sic]. So there was [sic] dozens of times, hundreds of times that they wouldn’t send me a pedigree like this [protocol letter] suggests and they would just call and say the mare is a stakes winner or the mare has been baron [sic] four years in a row or something like that, and we would talk and make a decision on what to do.
PID 3002 (Nielsen dep. at 105, emphasis added).
Because these are issues of material fact, I would vacate the grant of summary judgment to Crestwood on Everest’s implied contract claim.

2008 Agreement

The 2008 agreement clearly provides that Everest retained title to the Island Fashion filly until she sold. See PID 3457 (“the parties agree that Everest shall retain title and ownership to [Island Fashion and the 2008 Storm Cat/Island Fashion filly], from the Effective Date of this Agreement through the sale of said horses.”) And, as the district court and the majority observe, the agreement is silent on whether Everest could set a reserve on the Island Fashion filly. PID 4451; Maj. Op. at 447 ¶ 41. Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties. Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 384 (Ky.App.2002); Dennis v. Watson, 264 S.W.2d 858, 860 (Ky.1953). Because the district court did not consider such evidence, I would vacate the grant of summary judgment to Crest-wood on the question whether Everest breached the 2008 agreement by setting a reserve price on the Island Fashion Filly, and the award of damages to Crestwood. The majority’s determination that Everest has not shown damages is premature.

. Crestwood’s motion for summary judgment refers it as the “Animal Husbandry Letter.” PID 2489-90.

. The "protocol letter” from Nielsen to Pope McLean, Sr., at Crestwood states:
I believe we should establish a protocol for handling calls regarding seasons for “Petionville.”
All requests should be accompanied by Mare’s pedigree, race record, produce and last year’s breeding history (together with dates bred from the farm) and sent to me. I will respond within a very short time if the Mare will be satisfactory. Although I hope all Mares submitted will be fine, unfortunately a few may not be attractive, and I do not want to alienate or hurt anyone’s feelings unnecessarily. For this reason, a contract should not be approved or sent out without my approval.
Best regards,
EVEREST STABLES, INC.
*450 Jeffrey L. Nielsen
PID 2574.